# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-429V

|  |  |
|---|---|
| KEVIN CHARLES MCINTOSH,<br><br>           Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>           Respondent. | Chief Special Master Corcoran<br><br>Filed: June 1, 2026 |

*Renee Gentry, The Law Office of Renee J. Gentry, Washington, DC, for Petitioner.*

*Nina Ren, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION[1]

On March 28, 2023, Kevin Charles McIntosh filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). ECF No. 1 ("Petition"). Petitioner alleges that following his receipt of an influenza ("flu") vaccine on October 30, 2020, he suffered a right shoulder injury related to vaccine administration ("SIRVA"). Petition at ¶ 14.

As explained below, I find that Petitioner has provided insufficient proof to meet the Vaccine Act's "severity requirement." I therefore **dismiss** this case.

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.     Procedural History

On December 4, 2023, this case was assigned to the Special Processing Unit of the Office of Special Masters. ECF No. 14. The parties attempted to informally resolve the matter, but reached an impasse by July 29, 2024. ECF No. 23. On September 23, 2024, Respondent filed a Rule 4(c) Report setting forth his position that compensation would not be appropriate under the Vaccine Act. ECF No. 24 ("Rule 4(c) Report").

On October 8, 2024, I entered a scheduling order setting deadlines for briefing, and for Petitioner to file any additional evidence. ECF No. 26. Petitioner filed a brief in support of entitlement on November 21, 2024. ECF No. 27 ("Pet'r Br."). Respondent filed a response brief on January 6, 2025. ECF No. 28 ("Resp't Br.). Petitioner filed a reply on January 16, 2025 ("Pet'r Reply"). This matter is ripe for adjudication.

## II.     Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.     Petitioner's Vaccination and Initial Complaint of Right Shoulder Pain

On October 30, 2020, Petitioner received a flu vaccine in his right deltoid at the office of his primary care provider ("PCP"), Dr. Andrew Pitzak. Ex. 10 at 2. At the time of vaccination, Petitioner was 63 years old and in generally in good health. *See* Ex. 2 at 17. His only ongoing medical issues were hypertension, asthma, and heart palpitations.[3] *See id.* Petitioner had recently seen a chiropractor for a "mid-thoracic problem," but did not have any pre-existing shoulder-related issues. *See* Ex. 4 at 5.

After the vaccination, Petitioner returned to Dr. Pitzak on November 17, 2020, complaining of continued pain in his right shoulder. Ex. 2 at 14. Petitioner reported that his arm had been tender for a week, and was having trouble sleeping on that side. *Id.* Petitioner had "decreased range of motion particularly pain with flexion." *Id.* However, Petitioner also indicated that his symptoms were improving, as he stated that his shoulder "is getting better but wanted to know what was going on." *Id.*

Based on information provided by Petitioner, Dr. Pitzak expressed the view that the vaccine "was given almost in the subacromial space" and had not been entirely

---

[3] Petitioner filed medical records going back to when he was 16 years old in 1973. *See* Ex. 2 at 114.

intramuscularly delivered. *Id.* Dr. Pitzak diagnosed Petitioner with "an exacerbation of a tendinitis or even some subacromial bursitis." Dr. Pitzak did not measure Petitioner's ROM, but noted "pain with abduction and flexion past 90 degrees," "some additional discomfort with external rotation," and a "slightly positive" Empty Can Test. *Id.* at 16. For treatment, Dr. Pitzak recommended ice twice per day along with Voltaren gel and instructed Petitioner to "[c]ontinue with increasing range of motion exercises."[4] *Id.* at 14.

On November 23, 2020, Petitioner saw orthopedist Dr. Ryan Colley. *Id.* at 10. Petitioner stated that for several days after the vaccination, "he was unable to lift his arm due to pain." *Id.* Similar to his statement to Dr. Pitzak, Petitioner indicated that his pain had improved, but was still present to the extent that he woke up three times per night. *Id.* Dr. Colley recorded equal active and passive ROM and strength in both shoulders.[5] *Id.* at 11. Dr. Colley diagnosed Petitioner with right shoulder bursitis and "rotator cuff tendinitis after injection." *Id.* at 12. After discussing various treatment options for shoulder impingement, including physical therapy ("PT"), Petitioner elected to receive a right shoulder subacromial steroid injection. *Id.*

Dr. Colley instructed Petitioner to follow up in three months. *Id.* at 13. However, Petitioner did not return to Dr. Colley at that time (which would have been in late February), and in fact did not receive any medical care for the next six months.

### B.     Petitioner Received Minimal Medical Treatment Through July 2022

On June 2, 2021 (now over six months since his last shoulder-specific treatment encounter), Petitioner saw Dr. Pitzak for his annual physical exam. *Id.* at 5. Although "tendinitis of right shoulder" was listed as one of Petitioner's active problems, it does not appear that he discussed any such symptoms with Dr. Pitzak – new or resolved. *See id.* at 5-8. Rather, Dr. Pitzak wrote that Petitioner's "only complaint" was a "little bit of lower extremity edema by the end of the day," as well as "some mild urinary hesitancy with some nocturia 1-2 times at night." *Id.* Dr. Pitzak also did not note any musculoskeletal issues in his physical exam. *See id.* at 6-7. The overall focus of this appointment was on the management of Petitioner's medications, and the only plan was for Petitioner to be seen on a yearly basis or as needed. *See id.*

Petitioner then did not have any further medical appointments for *a year*, until his

---

[4] On November 20, 2020, Petitioner had an x-ray of his right shoulder, which showed a "[r]adiographically normal right shoulder with moderate/severe [acromioclavicular osteoarthritis]. *Id.* at 12.

[5] Petitioner displayed positive Neer and Hawkins signs in his right shoulder, although his left shoulder was not tested. *Id.* at 11.

next annual physical exam on June 3, 2022. *Id.* at 2-4. Again, even though "tendinitis of right shoulder" remained on Petitioner's list of active problems, there is no indication that Petitioner mentioned it as an ongoing complaint. *See id.* Instead, Petitioner stated that "overall he [was] doing quite well." *Id.* at 2. Petitioner's concerns related to side effects of his blood pressure and heart medications. *Id.* Further, Dr. Pitzak did not document any musculoskeletal findings other than tenderness of Petitioner's Achillies tendons. *Id.* at 4.

One month later, on July 25, 2022, Petitioner called his orthopedist, Dr. Colley. Ex. 3 at 8. Dr. Colley described Petitioner's comments as follows: "Patient reports steroid injection gave him significant relief for approximately 2 months. Now he gets a pain if he does overhead activities. He had no pain prior to his injection." *Id.* Dr. Colley further wrote that "as time goes on," he had become more concerned that Petitioner had developed a rotator cuff tear. *Id.* Dr. Colley recommended against further steroid injections and offered to order an MRI. *Id.* However, Petitioner declined the MRI "as he does not wish to pursue surgery." *Id.* Petitioner also indicated that he "would like to give it more time" and would call again if he wanted to move forward. *Id.*

Nonetheless, despite Dr. Colley's apparent reluctance, it appears that he did agree to administer a second right shoulder subacromial steroid injection to Petitioner three days later, on July 28, 2025. *Id.* at 6. Dr. Colley did not produce any notes for this visit, but used the billing codes for "pain in right shoulder" and "impingement syndrome right shoulder." *Id.*

Petitioner has not filed records establishing any further treatment.

### C.    Affidavit Evidence

Petitioner included three affidavits as exhibits with his March 28, 2023 Petition. In his own affidavit, after describing the initial pain and his appointments with Dr. Pitzak and Dr. Colley in November 2020, Petitioner testified that his "symptoms of tendonitis" had persisted for more than six months and that he "continue[d] to suffer from the effects of tendonitis and continue[d] to receive medical care." Ex. 5 at 2. Petitioner further stated that "[a]s a result of [his] tendonitis," he was unable to fully function in daily activities, "including playing catch with [his] grandsons, getting a full night's sleep, yard work, and anything requiring the full use of [his] right shoulder." *Id.*

Petitioner also submitted an affidavit by his wife, Judy McIntosh. According to Mrs. McIntosh, Petitioner "was in almost constant pain and could hardly use his right arm for many months." Ex. 6 at 2. Further, Mrs. McIntosh recalled an incident from "a few weeks ago," in which Petitioner put his arm around her and "had to take it down after a few

minutes because of the pain." *Id.* Mrs. McIntosh concluded that Petitioner's recovery "has been long and ongoing." *Id.*

Similarly, Petitioner's son, Casey McIntosh, also provided an affidavit. According to Mr. McIntosh, Petitioner had been unable to help with home improvement projects and other physical tasks after the vaccination. Ex. 7 at 2. Petitioner was also unable to play with his grandchildren or throw a ball. *Id.* Mr. McIntosh had also observed his father "grimace in pain after moving his arm or making other common movements numerous times" since the vaccination. *Id.*

## III.    Analysis

### A.    Severity Requirement

To receive compensation under the Vaccine Program, a petitioner must prove either (1) that he suffered an injury falling within the Vaccine Injury Table, or (2) that he suffered an injury that was actually caused by his vaccine. *See* Sections 13(a)(1)(A) and 11(c)(1). In either case, however, a petitioner must demonstrate that the injured person has "suffered the residual effects or complications of his illness, disability, injury, or condition for more than six months after the administration of the vaccine."[6] Section 11(c)(1)(D)(i). Petitions may appropriately be dismissed for failure to substantiate the Vaccine Act's severity requirement. *See, e.g.*, *Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4–5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré Syndrome resolved less than two months after onset).

The petitioner carries the burden of establishing the matters required in the petition, including the severity requirement, by a preponderance of the evidence. Section 13(a)(1)(A); *see Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65-66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 2014). Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

---

[6] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

### B.    Legal Standards for Table SIRVA Claims

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). The Act prohibits finding that a petitioner has met this burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a). If a petitioner establishes a Table injury, causation is presumed.

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). Medical records must be considered, *see* Section 13(b)(1), and are generally afforded substantial weight. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). And the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The factual matters required to prove elements of a Vaccine Act claim may be established by a *mix* of witness statements and record proof, with the special master required to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 (2013) (citing Section 12(d)(3); Vaccine Rule 8), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). A SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine.

6

42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### C.    Petitioner Has Not Established Severity with Preponderant Evidence

In this case, to meet the statutory six-month severity requirement, Mr. McIntosh must preponderantly demonstrate that he suffered the "residual effects or complications" of his claimed injury beyond April 30, 2021. *See* Section 11(c)(1)(D)(i). Respondent's challenge centers on Petitioner's lack of *any* formal treatment for his right shoulder for over a year and a half – between late-November 2020 and July 2022. Rule 4(c) Report at 6-7; Resp't Br. at 5-8. Further, Respondent emphasizes that during this gap, Petitioner

7

had two annual physicals in which he described a variety of other ailments, but apparently did not discuss right shoulder pain. *See id.* Respondent thus argues that the nature of the medical records "affirmatively indicate[s] the absence of shoulder symptoms during the relevant period." Resp't Br. at 8.

In his brief, Petitioner attempts to invoke the COVID-19 Pandemic as the basis for the lengthy treatment gap. He contends that the pandemic "severely restricted access to routine medical care such as PT for a SIRVA injury" and that as a result he "chose a conservative treatment, *i.e.*, no PT" because he was the care-giver for his 86-year old father at the time. Pet'r Br. at 3, 6. However, I give these arguments little weight. Petitioner did not even include this (or any) explanation in his own affidavit, and did not specifically state that he would have sought out additional treatment but-for the Pandemic. *See* Ex. 5 at 1-2.

Moreover, Petitioner's own records strongly suggest that his right shoulder pain resolved not long after the vaccination at issue, and that he did not have any other major health concerns during the subsequent treatment gap. Petitioner was, in fact, willing and able to access routine medical care, as evidenced by his in-person primary and orthopedic appointments after the start of the pandemic in November 2020. Petitioner has not provided any explanation for why, having seen Dr. Colley once, he waited until July 2022 to return. Petitioner's attendance at two in-person annual physical exams also cuts heavily against his arguments about severity. Even if he had been attempting to minimize his interactions with health care providers, the Pandemic would not have prevented him from *merely discussing* right shoulder pain when he was examined by Dr. Pitzak in June 2021 and June 2022.

Petitioner points to the fact that tendinitis of the right shoulder was listed as an active problem in Dr. Pitzak's notes as proof that this was an ongoing issue at both annual physicals. *See* Pet'r Br. at 8. Dr. Pitzak documented that he "reviewed the appropriate physician checklist and worksheets," which Petitioner interprets as meaning that Dr. Pitzak and Petitioner reviewed the list of active problems. *See id.* However, this argument cuts against Petitioner – if Petitioner had reported any right shoulder complaints or symptoms in response to any review, Dr. Pitzak reasonably would have included a further history and treatment plan, as he did for Petitioner's other chronic conditions. *See* Ex. 2 at 2, 5.

Petitioner also argues that the July 2022 appointment with Dr. Colley constitutes "direct objective evidence" to link his symptoms at that time back to the October 2020 vaccination. Pet'r Br. at 8; Pet'r Reply at 2. But neither Petitioner nor Dr. Colley themselves made that connection. Petitioner does not explain why, if the first steroid

8

injection in November 2020 only gave two months of relief, he did not return to Dr. Colley as recommended.[7] *See* Ex. 3 at 8. Dr. Colley's brief note that "[n]ow [Petitioner] gets a pain if he does overhead activities" is vague as to when this pain began or its cause. *See id.* Dr. Colley's concern that "[a]s time goes on" Petitioner could have developed a rotator cuff tear does suggest some linkage to an earlier injury, but again is unclear when Petitioner's pain reemerged. *See id.* Contrary to Petitioner's argument, Dr. Colley's notes cannot reasonably be read as assessing Petitioner's pain as a "continuation and sequelae of the original SIRVA injury and not some new independent condition" or characterizing the pain as an "exacerbation" of the original injury. *See id.*

Fundamentally, Petitioner relies on his own testimony to establish that his shoulder pain persisted for more than six months. *See* Pet'r Br. at 4; Pet'r Reply at 2-3. In reaction to Respondent's argument that these statements are entitled to little weight, Petitioner emphasizes that his testimony is not in conflict with any medical records because they are silent regarding the condition of his right shoulder between November 2020 and July 2022. *See* Pet'r Br. at 6; Pet'r Reply at 3. Petitioner thus attempts to frame his testimony as a bolster to the medical records. *See* Pet'r Reply at 3. Further, Petitioner cites *Kirby* for the proposition that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." Pet'r Br. at 7 (quoting 997 F.3d at 1383).

This argument is unpersuasive. Petitioner's medical records are not merely silent or ambivalent about right shoulder pain. Rather, they affirmatively set forth what concerns Petitioner did have at those treatment events. Thus, at Petitioner's June 2021 and June 2022 annual physicals, he endorsed a small number of unrelated health concerns, but without mentioning his right shoulder. *See* Ex. 2 at 2, 5. With his affidavit, Petitioner does not fill any gap in these documents, but is instead attempting to alter or contradict the extent to which these contemporaneous records can be understood to establish what he actually told Dr. Pitzak was currently troubling him. Petitioner's statements (and those of his wife and son) do not engage with these appointments or his documented behavior in ceasing right shoulder treatment between November 2020 and July 2022. Petitioner's actions, as reflected in these records, strongly indicate that he was no longer experiencing any right shoulder pain. The inferences to be drawn from these records should not be disregarded in favor of the weaker argument that their failure to say *something* about shoulder pain opens the door to Petitioner "filling in the blanks," so to speak, with after-the-fact, retroactive complaints of pain. *See* Section 13(a). Further, the affidavits are

---

[7] Petitioner's reliance on the idea that the temporary pain relief provided by a steroid injection could serve to bridge a treatment gap over the six month severity requirement is misplaced. *See* Pet'r Reply on 2. Here, Petitioner specifically did not report a significant period of relief, yet he did not seek out additional right shoulder treatment for another year and a half.

cursory and offer only flat conclusions that he continued to suffer from the effects of tendonitis. I therefore give them little weight.

In light of Petitioner's extended gap in treatment and the vagueness of his July 2022 complaint to Dr. Colley, I conclude that Petitioner has not met the sixth-month severity requirement.[8]

## Conclusion

Petitioner has presented insufficient proof to establish the six-month severity requirement. Section 11(c)(1)(D). Therefore, he is ineligible to pursue compensation. In the absence of a timely-filed motion for review (*see* Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[8] Respondent also argues that Petitioner has not demonstrated that he suffered reduced ROM, contrary to the Table SIRVA QAI. Rule 4(c) Report at 8; Resp't Br. at 8. Respondent has the better argument on this point. Petitioner admits that Dr. Colley documented normal ROM. *See* Pet'r Br. at 8; Pet'r Reply at 3-4. Although Dr. Patzik encouraged Petitioner to continue to "increasing range of motion exercises," he only documented pain with motion. Petitioner's arguments regarding the sufficiency of painful motion are contrary to *Bolick v. Sec'y of Health & Hum. Servs.*, No. 20-893V, 2023 WL 8187307, at *8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). Thus, even if severity had been met, it is not likely a Table SIRVA claim could be advanced given the lack of evidence of ROM limitations.

[9] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.